**Opinion issued December 17, 2024**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-23-00229-CR

———————————

**DANIEL TOOMBS, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 149th District Court**
**Brazoria County, Texas**
**Trial Court Case No. 96462-CR**

## MEMORANDUM OPINION

A jury convicted Daniel Toombs of aggravated robbery and sentenced him to 50 years' confinement after finding the indictment's enhancement paragraphs true.[1]

Toombs contends the trial court erred: (1) because there was insufficient evidence

---

[1] *See* TEX. PENAL CODE § 29.03(a)(2)–(3)(A).

to support his conviction; (2) by denying his motion for mistrial; and (3) by allowing evidence of extraneous offenses during the guilt/innocence phase of the trial.

We hold there was sufficient evidence introduced at trial to support Toombs's conviction. But because the introduction of extraneous offenses was a harmful error that affected Toombs's substantial rights, we reverse and remand for a new trial.

## Background

### A.     The Robbery of Smith's Grocery Store.

One evening in June 2022, a masked man entered Smith's Grocery Store in Angleton and pointed a handgun at the attendant. The attendant opened the cash register, and the robber removed about $600 from the drawer. The robber took the attendant's phone and fled the scene with the money from the register. The attendant, who was 66 years old at the time, testified that he feared for his life during this encounter. The attendant pressed a "panic button," which alerted the police.

Corporal S. Slawson of the Angleton Police Department responded and spoke with the attendant. The attendant, who was upset but uninjured, told Corporal Slawson a male had entered the store with a gun, robbed him, and fled. Corporal Slawson searched the area in the direction in which the robber fled but found nothing of note. He returned to the store to take the attendant's statement.

By the time Corporal Slawson returned to the store, other Angleton police officers had arrived. Sergeant S. Wade began reviewing video from the store's

security cameras. Based on the video footage and his conversation with the attendant, Sergeant Wade developed a general description of the suspect as a "black male wearing blue jeans and a jacket," with a red shirt underneath the jacket. Another officer, Detective Sergeant C. Land, testified that based on the video footage, the suspect appeared to be about six feet two inches tall and wearing a mask, a cap, blue gloves, a dark shirt, and red shoes, and he was carrying a pistol. Sergeant Land also testified that the suspect's pants "stuck out to [him] from the video in the store."

As Corporal Slawson was returning to Smith's Grocery after canvassing the surrounding area, Sergeant Wade radioed him to let him know a black male named D. Nelson had ridden a bicycle to the store, seeking to buy cigarettes. Nelson was wearing a red shirt and long pants when he arrived. Corporal Slawson knew Nelson before the Smith's Grocery Store robbery as someone who lived in the area. Both Corporal Slawson and Sergeant Wade talked to Nelson, but neither of them believed he was a suspect. As Corporal Slawson was discussing Nelson with Segreant Wade, he briefly muted his body cam's microphone; he testified he could not recall the substance of their muted discussion.

Because the Smith's Grocery attendant had a language barrier preventing him from communicating effectively with the officers, Corporal Slawson and Sergeant Wade called the attendant's son. The son used the "Find My iPhone" function on his father's phone to track it. Using that application, the officers searched the area and

3

found the phone on top of a storage container across the street from Smith's Grocery Store. They also found a pair of tie-died sweatpants, a pair of blue latex gloves, and a mask on or near the container. Down the street, about 60 yards from the store, the officers found two 20-dollar bills, a 50-dollar money band, and an empty plastic bag from the store.

Sergeant Land later posted still photographs of the suspect, taken from the store's security camera footage, on the Angleton Police's Facebook page. A few days later, he was put in touch with M. Nichols, who lived a "couple houses down" the street from Toombs at the time of the robbery. Sergeant Land was familiar with Nichols because she had recently been arrested, along with Toombs, in a separate incident.

Sergeant Land interviewed Nichols about the robbery, during which he showed her the video footage from the surveillance cameras at Smith's Grocery Store. Nichols identified Toombs as the robber in the video. She testified that "the day after Smith's got robbed, he was still wearing the same clothes," including "some, like, acid-washed jeans," a "camouflage jacket," and "some red shoes." Nichols also told Sergeant Land she recalled seeing Toombs in "some tie-dye pants" before the robbery, that she was "sure" she saw him wearing the pants the day after the robbery, and that the pants the robber wore in the video were "identical to what [Toombs] had on before and after" the robbery. In addition, Nichols told Sergeant

4

Land that Toombs had a distinctive gait when he walked, because he walks "like a duck," and she recognized the robber in the video as having Tombs's "specific walk." Finally, Nichols testified that a female acquaintance of Toombs had the same "purple gloves, the hair dying gloves," as those being worn by the robber in the video.

Nichols also testified that "it was well-known fact" in the area that the power at Toombs's house had been off before the robbery. The power was restored after the robbery, and "that was a big deal."

In addition to having been arrested with Toombs a short time before the Smith's Grocery robbery, Nichols testified she had been convicted two times previously for theft, as well as for drug offenses.

Sergeant Land sent the items collected from the scene of the robbery to a Texas Department of Public Safety crime lab for DNA analysis, along with a buccal swab containing Toombs's DNA. The lab conducted a comparative analysis of Toombs's DNA with the sweatpants taken from the scene of the robbery, which revealed that the sweatpants contained a mixture of Toombs's DNA and the DNA of two other unknown individuals.

About two months after the robbery, Sergeant Land and other police officers executed a search warrant for the house where Toombs had been living at the time of the robbery. Land testified they were searching for the weapon used during the

5

robbery or clothing worn by the suspect in the video. The officers did not find either of those things, nor did the search turn up any other evidence connecting Toombs to the robbery. Sergeant Land testified they did not find purple gloves, red shoes, or a red shirt during the search. Sergeant Land also testified that two other men lived at the residence along with Toombs at the time of the robbery, but he never interviewed them.

A grand jury indicted Toombs on an aggravated robbery charge. The indictment contained enhancement paragraphs based on six prior felony convictions: a 1988 conviction for aggravated robbery; a 1998 conviction for theft; a 1991 conviction for unauthorized use of a vehicle; a 1996 conviction for obstruction or retaliation; a 2009 conviction for possession of a controlled substance; and a 2015 conviction for enticing a child.

While he was in jail awaiting trial, Toombs spoke by telephone with his half-brother, C. Thomas. The call was recorded. During the call, Toombs asked Thomas to "tell them we were watching a baseball game" the night of the Smith's Grocery Store robbery.

**B.     Trial Testimony About Extraneous Offenses.**

During the guilt/innocence phase of the trial, the defense contended the State failed to establish that Toombs, and not someone else, was the robber of Smith's Grocery Store. In response, the State sought to introduce evidence of other crimes,

6

wrongs, or acts in which Toombs had allegedly been involved to prove he was the robber.

The extraneous offenses the State sought to introduce were the burglaries of two laundromats. In July 2021, about 11 months before the Smith's Grocery Store robbery, two laundromats in Angleton had coins stolen from their laundry machines. Drops of blood were found at both laundromats, and the DPS crime lab determined the blood contained Toombs's DNA. The State thus sought to introduce testimony about the fact that Toombs's DNA had been found at the scene of the earlier laundromat burglaries. At trial, the State presented no evidence that Toombs was the laundromat burglar, but only that his DNA was found at the laundromats.

The State nonetheless contended that evidence of the laundromat burglaries was admissible to establish Toombs's identity under the "Doctrine of Chances." According to the State, the Doctrine of Chances allows for the introduction of extraneous offenses when they are "highly unusual events [that] are unlikely to repeat themselves inadvertently or by happenstance." The State argued before the trial court that the "highly unusual event" involved here was the fact that Toombs's DNA had been found at three different crime scenes.

The State based this argument largely on Sergeant Land's testimony. At a hearing conducted outside the presence of the jury, Land testified that Toombs's DNA was found on both the sweatpants recovered from the Smith's Grocery Store

robbery, as well as "at two different crime scenes also located in Angleton, Texas," both of which were laundromats. Sergeant Land also testified that finding the DNA of one person at three different crime scenes would be "an unusual occurrence," and that he had worked "probably a good 1500 cases" during his career without ever having encountered "the same person on three different ones."

Defense counsel objected repeatedly to the introduction of extraneous offense evidence under Texas Rules of Evidence 403 and 404. She argued that testimony about the laundromat burglaries would not only confuse the jury but also have a prejudicial effect that outweighed its probative value. In addition, defense counsel argued the Doctrine of Chances was inapplicable because the laundromat burglaries were dissimilar in nature to the robbery of Smith's Grocery Store; here, "the highly unusual [event] is basically the collection and finding of evidence by officers as to [Toombs's] DNA," whereas "[t]he event that we should be focused on in the Doctrine of Chances is the actual offense itself, not the location or the finding of evidence by the detectives. . . . [T]here is no highly unusual event [in] a smash-and-grab from a washateria or a robbery from a quickie mart."

The trial court overruled the objections and allowed evidence that Toombs's DNA had been found at the laundromats. The trial court said that "[b]ased on the officer testifying that in his almost 20-year career, he has come across only this defendant showing—having DNA show up at three different crime scenes involving

property-type thefts, whether it's thefts or robberies. So I think it could come in under the Doctrine of Chances." The trial court apparently based its ruling on the idea that the Smith's Grocery Store robbery and the laundromat burglaries were similar in nature because they both involved thefts of property: "What I want to make clear is that under the Doctrine of Chances [the extraneous offenses] are similar somewhat in nature. We're talking about theft offenses, property offenses." The trial court ultimately allowed the State to introduce a report indicating that Toombs's DNA had been found at the scenes of the laundromat burglaries, as well as testimony from Sergeant Land concerning the report.

But the trial court instructed the State that in presenting its extraneous offense evidence to the jury, it could not introduce details concerning the nature of the laundromat burglaries; it could say only that Toombs's DNA had been found at other "crime scenes or investigations" in Angleton. The trial court said it wanted to use "such a general term" to ensure any discussion of extraneous offenses was "limited to the two that have the DNA that respond back to the defendant." The trial court continued, "what we're all trying to do, is dance around what [Toombs] is charged with by limiting it to just investigations. . . . If [the defense] start[s] making [the State] go specific, then I'm going to allow them to open the door to the specific."

The State was thus allowed to introduce evidence of the extraneous offenses, so long as it confined the testimony to a discussion of "crime scenes" and

"investigations." But before it did so, the trial court called the jury back into the courtroom and read it a limiting instruction:

> The defendant is on trial solely on the charge contained in the indictment. In reference to the evidence that is about to be admitted, if any, that the defendant has recently participated in recent transactions or acts other than but similar to that which is charged in the indictment in this case, you are instructed that you cannot consider such transaction or acts, if any, for any purpose unless you find and believe beyond a reasonable doubt that the defendant participated in such transactions or committed such acts, if any, and even then you may only consider the same for the purposes of determining intent or knowledge or identity or motive or common plan or scheme, if it does, and for no other purpose.

The State called Sergeant Land to the stand. Testifying in front of the jury, he authenticated a report indicating Toombs's DNA had been found at the scenes of the laundromat burglaries. Land then testified he knew of "other investigations that involve the defendant in this case." When asked "how many other investigations were you currently looking at with this defendant," Land answered, "four." Outside the presence of the jury, defense counsel moved for a mistrial because, by referring to "four" additional investigations, Land had raised extraneous offenses other than the two laundromat burglaries. The trial court denied the mistrial.

Before the jury again, Sergeant Land next testified about the report. He noted that it discussed two cases involving "swabs from the stain on the floor" that "came back with the name on the bottom" of the report, referring to Toombs's name. On

10

cross, Sergeant Land testified that the report was discussing "washateria burglaries." On redirect, he explained that a "washeteria theft" is "pretty much when they go in and break into machines and take coins." But Land also said he does not "know any details in terms of time of day or anything like that with these washateria burglaries."

Neither the State nor the defense introduced further evidence concerning the laundromat burglaries. The jury did not hear any evidence about how or when they were committed, or about how Toombs might have been involved, nor did it hear any explanation for why Toombs's DNA was present in the laundromats. All the jury heard was that two laundromats had been burglarized and that Toombs's DNA was found at the scene.

The State called A. Falcone, a forensic scientist with the DPS crime lab, to testify about the collection and analysis of DNA evidence. Falcone testified about the reliability of the DNA evidence found on the sweatpants collected from Smith's Grocery Store, saying that the "probability of obtaining this mixture profile if the DNA came from Daniel Toombs and two unrelated, unknown individuals is 5.42 quadrillion times greater than the probability of obtaining this profile if the DNA came from three unrelated, unknown individuals." The State then asked Falcone to write the number 5.42 quadrillion on a board, alongside the number 8 billion, the approximate population of the earth.

The State included the extraneous laundromat burglaries in its closing. It told the jurors, Toombs's "DNA is also at the crime scene of two other locations in this city. Two other burglaries his DNA is also at. And you can use that to think, Well, what seems more likely? That it was him wearing those pants that day that the robbery took place or that it was some other random person nobody knows and his DNA just happened to be on those pants that were left at the scene of that robbery? Because you know that his DNA is at the scene of two other burglaries." Later in its closing, the State also told the jurors that "we heard about . . . how his DNA was in other places, other crime scenes in this same city." And it emphasized the reliability of DNA evidence, saying "the DNA doesn't lie. It doesn't have agendas. It doesn't have biases. It's either there or it's not, and that's a huge number."

The jury found Toombs guilty of the aggravated robbery of Smith's Grocery Store and, after hearing evidence in the punishment phase of the trial, sentenced him to 50 years in confinement. Toombs appealed.

## Discussion

Toombs raises three issues on appeal. First, he argues there was insufficient evidence to convict him. Second, he argues the trial court erred by allowing extraneous offense evidence of the laundromat burglaries, which he contends was both more prejudicial than probative and improper character evidence, such that it

should have been excluded under Texas Rules of Evidence 403 and 404. And finally, Toombs argues the trial court erred by denying his motion for mistrial.

## I. There Was Sufficient Evidence to Support Toombs's Conviction.

Toombs argues first that there was insufficient evidence to support the jury's guilty verdict. His sufficiency argument focuses on the identification of the Smith's Grocery Store robber; he claims there was insufficient evidence at trial from which a rational jury could have concluded he committed the crime.

### A. Standard of Review.

We review a challenge to the sufficiency of the evidence, regardless of whether it is denominated as a legal or factual sufficiency challenge, under the standard of review set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979). *See Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010). Under the *Jackson* standard, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the charged offense beyond a reasonable doubt. *See Jackson*, 443 U.S. at 319; *Zuniga v. State*, 551 S.W.3d 729, 732 (Tex. Crim. App. 2018). When the trial court makes findings of fact, we determine whether the evidence, viewed in the light most favorable to the trial court's ruling, supports these fact findings. *See State v. Hardin*, 664 S.W.3d 867, 872 (Tex. Crim. App. 2022). But "[w]e review legal conclusions, such as the construction of a statute, *de novo*." *See id.*

13

Viewing the evidence in the light most favorable to the verdict requires that we consider all the evidence admitted at trial, including improperly admitted evidence. *See Winfrey v. State*, 393 S.W.3d 763, 767 (Tex. Crim. App. 2013); *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). We defer to the factfinder's credibility and weight determinations because the factfinder is the sole judge of the witnesses' credibility and the weight to be given to their testimony. *See Winfrey*, 393 S.W.3d at 768. The *Jackson* standard is deferential and accounts for the factfinder's duty to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from the facts. *See Jackson*, 443 U.S. at 319; *Zuniga*, 551 S.W.3d at 732. We may not reevaluate the weight and credibility of the evidence to substitute our judgment for that of the factfinder. *See Leroy v. State*, 512 S.W.3d 540, 543 (Tex. App.—Houston [1st Dist.] 2016, no pet.). Instead, we determine whether the necessary inferences are based on all the evidence presented at trial and viewed in the light most favorable to the verdict. *See Clement v. State*, 248 S.W.3d 791, 796 (Tex. App.—Fort Worth 2008, no pet.). Therefore, if the record supports conflicting inferences, we presume the factfinder resolved the conflicts in favor of the verdict, and we defer to that determination. *See Jackson*, 443 U.S. at 326; *Merritt v. State*, 368 S.W.3d 516, 525–26 (Tex. Crim. App. 2012).

We treat direct and circumstantial evidence equally under this standard. *See Isassi v. State*, 330 S.W.3d 633, 638 (Tex. Crim. App. 2010); *Hooper v. State*, 214

S.W.3d 9, 13 (Tex. Crim. App. 2007). It is not necessary that the evidence directly prove the defendant's guilt; circumstantial evidence is as probative as direct evidence in establishing a defendant's guilt, and circumstantial evidence can alone be sufficient to establish guilt. *See Carrizales v. State*, 414 S.W.3d 737, 742 (Tex. Crim. App. 2013) (citing *Hooper*, 214 S.W.3d at 13). Therefore, in evaluating the sufficiency of the evidence, we must consider the "cumulative force of all the evidence." *Villa v. State*, 514 S.W.3d 227, 232 (Tex. Crim. App. 2017). Each fact need not point directly and independently to guilt if the cumulative force of all incriminating circumstances is sufficient to support the conviction. *See Hooper*, 214 S.W.3d at 13.

## B. The Evidence Was Sufficient to Support the Jury's Guilty Verdict.

A person commits robbery "if, in the course of committing theft . . . and with intent to obtain or maintain control of the property, he . . . intentionally or knowingly threatens or places another in fear of imminent bodily injury or death." TEX. PENAL CODE § 29.02(a)(2). A person commits aggravated robbery "if he commits robbery . . . and he . . . uses or exhibits a deadly weapon; or . . . threatens or places another person in fear of imminent bodily injury or death, if the other person is . . . 65 years of age or older . . . ." *Id*. § 29.03(a)(2)–(3)(A).

Toombs contends the State failed to prove he committed the aggravated robbery of Smith's Grocery Store beyond a reasonable doubt because the weight of

15

the evidence does not point to him as the robber. Toombs argues the robber's identity remains in question because: (1) the Smith's Grocery Store attendant did not identify him as the perpetrator at trial; (2) Nichols, Toombs's neighbor, was not a credible witness; (3) the sweatpants taken from the scene of the robbery contained not only Toombs's DNA but also the DNA of two other unidentified individuals; (4) no DNA sample was taken from Nelson, the man who appeared at Smith's Grocery Store the night of the robbery matching the description of the perpetrator; and (5) the police did not find a gun when they searched Toombs's residence. According to Toombs, these five points "overwhelmingly outweigh[]" the evidence supporting the jury's conviction.

Toombs is correct that the Smith's Grocery Store attendant did not identify him as the robber. But Nichols, Toombs's neighbor, did. Nichols testified that she recognized the clothes Toombs was wearing in the video of the robbery, including his pants and gloves, as well as Toombs's distinctive walk. And "[i]t is well-established that a conviction may be based on the testimony of a single eyewitness." *Davis v. State*, 177 S.W.3d 355, 359 (Tex. App.—Houston [1st Dist.] 2005, no pet.) (affirming conviction for aggravated robbery where central issue involved witness's credibility).

A rational jury also could have concluded that the attendant's failure to identify Toombs as the robber was understandable. The attendant testified he feared

16

for his life during the robbery, and footage from the store's cameras, which the jury saw, showed the robber wearing a mask, gloves, and a hat. The jury reasonably could have attributed the attendant's inability to identify the suspect to the duress he was under, coupled with the fact that the robber was wearing a mask and a hat. *See Neighbors v. State*, No. 2-07-176-CR, 2008 WL 2404437, at *4 (Tex. App.—Fort Worth June 12, 2008, pet. ref'd) (mem. op., not designated for publication) (upholding aggravated robbery conviction against sufficiency challenge notwithstanding that victim could not identify perpetrator because other evidence showed "a rational trier of fact could have found beyond a reasonable doubt that appellant committed aggravated robbery").

Circumstantial evidence also supports the jury's determination that Toombs robbed Smith's Grocery Store. *See Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013) ("Circumstantial evidence is as probative as direct evidence in establishing the guilt of an actor, and circumstantial evidence alone can be sufficient to establish guilt." (citation and internal quotation marks omitted)). For example, Nichols testified that while before the robbery "none of them [living at Toombs's residence] had any money" and the electricity at his house had been turned off, after the robbery their power was restored, "they were all bragging" about the power being restored, and "[a]ll of a sudden everybody was just doing so good."

17

Toombs's contention that Nichols was not a credible witness does not require a different result. Toombs points out that Nichols had prior drug and theft convictions, and that she had previously been to jail and prison. But the jury knew about those convictions and credited Nichols's testimony nevertheless. We may not disturb either the jury's determination of Nichols's credibility or the weight it gave to her testimony. A "reviewing court must defer to the jury's credibility and weight determinations because the jury is the sole judge of witness' credibility and the weight to be given testimony." *Martin v. State*, 635 S.W.3d 672, 679 (Tex. Crim. App. 2021) (citation and internal quotation marks omitted).

Nor is our conclusion changed because Nichols's testimony diverged at times from other evidence presented at trial. *See McIntosh v. State*, 855 S.W.2d 753, 763 (Tex. Crim. App. 1993) ("The jury, not this Court, may accept one party's statement of facts over another party, disbelieve one party's evidence even if uncontroverted, and resolve any inconsistencies in favor of one party over the other."). For instance, Nichols testified she saw Toombs wearing the same pants as the robber both before and after the robbery, while Sergeant Land testified he collected the pants from the scene of the robbery on the night it occurred. And while Nichols testified that the electricity at Toombs's house had been off before the robbery but was restored after it, Thomas, who also lived at the house, testified that the electricity had not been off at all that summer. To the extent there were inconsistencies in this testimony, it was

18

for the jury to resolve them, and in reviewing a conviction "we must presume the trier of fact resolved any conflict in favor of the prosecution." *Garcia v. State*, No. 01-00-00886-CR, 2001 WL 1199873, at *2 (Tex. App.—Houston [1st Dist.] Oct. 11, 2001, no pet.) (not designated for publication) (citing *Turro v. State*, 867 S.W.2d 43, 47 (Tex. Crim. App. 1993)); *accord Bryant v. State*, No. 14-15-00819-CR, 2016 WL 4705157, at *4 (Tex. App.—Houston [1st Dist. Sept. 8, 2016, pet. ref'd) (mem. op., not designated for publication) ("[T]he fact that there may be inconsistent evidence regarding the clothing worn by the robbers does not render the evidence insufficient as we presume the trier of fact resolved any conflicts in the evidence in favor of the State." (citing *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007)).

Moreover, Nichols's testimony was not the only evidence at trial from which the jury could have concluded Toombs was the Smith's Grocery Store robber. His DNA was found on the sweatpants recovered from the scene, along with the victim's cell phone and other items from the store. And the jury heard testimony from Toombs's half-brother that Toombs had asked him to say he had an alibi for the night of the robbery, namely, that the two of them were watching a baseball game together. *Cf. Longoria v. State*, 154 S.W.3d 747, 757 (Tex. App.—Houston [14th Dist.] 2004, pet. ref'd) ("[A]n attempt to procure a false alibi is some evidence of guilt"); *accord King v. State*, No. 01-23-00094-CR, 2024 WL 1220546, at *7 (Tex.

App.—Houston [1st Dist.] Mar. 21, 2024, pet. pending) (mem. op., not designated for publication) ("Lying to police officers is conduct showing a consciousness of guilt and may be considered as circumstantial evidence of guilt.").

Toombs's remaining sufficiency arguments likewise do not outweigh the evidence presented at trial identifying him as the Smith's Grocery Store robber. That other persons' DNA was found on the sweatpants taken from the crime scene does not outweigh the fact that Toombs's DNA was also found on them. And the State's decision not to further investigate other leads does not negate the evidence introduced at trial from which a jury rationally could have determined that Toombs was the Smith's Grocery Store robber. While Toombs relies on these perceived weaknesses in discrete pieces of evidence, in a sufficiency challenge we must look at the "cumulative force of all the evidence." *Merritt*, 368 S.W.3d at 526. Viewing all the evidence in the light most favorable to the verdict, we conclude that a rational jury could have found beyond a reasonable doubt that Toombs committed the aggravated robbery of Smith's Grocery Store. *See Babcock v. State*, 501 S.W.3d 651, 654 (Tex. App.—Eastland 2016, pet. refused) ("The standard of review for sufficiency of the evidence is whether any rational jury could have found [the defendant] guilty beyond a reasonable doubt." (citing *Brooks v. State*, 323 S.W.3d 893, 912 (Tex. Crim. App. 2010))). We overrule Toombs's first issue.

## II.  The Trial Court Erred by Allowing Extraneous Offense Evidence.

In his second issue, Toombs contends the trial court erred by permitting the introduction of evidence concerning the extraneous laundromat burglaries. He argues this evidence was impermissible character-propensity evidence, and that it was more prejudicial than probative.

### A.  Standard of Review.

We review a trial court's decision to admit extraneous offense evidence under the abuse of discretion standard. *Devoe v. State*, 354 S.W.3d 457, 469 (Tex. Crim. App. 2011). A trial court's ruling to admit extraneous offense evidence will be upheld if it is "within the zone of reasonable disagreement." *Fowler v. State*, 544 S.W.3d 844, 848 (Tex. Crim. App. 2018).

A trial court's ruling on extraneous offense evidence is generally within the zone of reasonable disagreement "if the evidence shows that 1) an extraneous transaction is relevant to a material, non-propensity issue, and 2) the probative value of that evidence is not substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." *De La Paz v. State*, 279 S.W.3d 336, 344 (Tex. Crim. App. 2009). We uphold an evidentiary ruling under any applicable theory of law, "even if the trial judge gave the wrong reason for his right ruling." *Id.* (citing *Sewell v. State*, 629 S.W.2d 42, 45 (Tex. Crim. App. 1982)).

**B.     Rule 404(b) and the Admission of Extraneous Offense Evidence.**

"The general rule is that the defendant is to be tried only for the offense charged, not for any other crimes or for being a criminal generally." *Segundo v. State*, 270 S.W.3d 79, 87 (Tex. Crim. App. 2008). This principle is captured in Texas Rule of Evidence 404(b)(1): "Evidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."

Rule 404(b)(1) thus prohibits extraneous offense evidence when offered to prove a person's character, from which the trier of fact is to infer the person acted in conformity with that character trait on the occasion in question. *See Montgomery v. State*, 810 S.W.2d 372, 387–88 (Tex. Crim. App. 1990) (op. on reh'g). The Texas Court of Criminal Appeals uses this hypothetical example to illustrate the rule's application: "in an injury to a child prosecution, the State might wish to offer other instances in which the defendant beat this or another child to prove he is a 'chronic child abuser.' The jury would then be invited to infer that, because the defendant is a chronic child abuser, he abused the child on this charged occasion. That is precisely the character-propensity purpose prohibited by Rule 404(b)." *Johnston v. State*, 145 S.W.3d 215, 219 (Tex. Crim. App. 2004).

But extraneous offense evidence is not categorically inadmissible; it "may be admissible for other purposes, such as proof of motive, opportunity, intent,

preparation, plan, knowledge, identity, or absence of mistake or accident." TEX. R. EVID. 404(b)(2). Therefore, when a defendant's identity as the perpetrator of the crime is at issue, using extraneous offense evidence to establish his identity may be allowed. *See Page v. State*, 213 S.W.3d 332, 336 (Tex. Crim. App. 2006).

Simply placing identity at issue does not, by itself, make extraneous offense evidence admissible. *See Jabari v. State*, 273 S.W.3d 745, 751 (Tex. App.—Houston [1st Dist.] 2008, no pet.) (raising the issue of identity "does not automatically render evidence of an extraneous offense admissible"). It still must be admissible under Rule 404(b)—that is, it must be introduced for the purpose of establishing a defendant's identity (or for one of the other permissible purposes listed in the Rule), rather than for character-propensity purposes. TEX. R. EVID. 404. Extraneous offense evidence is thus admissible under Rule 404(b) only if it is "relevant to a fact of consequence in the case apart from its tendency to show action in conformity with character." *Johnston*, 145 S.W.3d at 220.

The Doctrine of Chances also informs the extent to which extraneous offenses can be used to prove identity. *See Evans v. State*, No. 12-14-00053-CR, 2015 WL 3609085, at *2 (Tex. App.—Tyler June 10, 2015, pet. ref'd) (mem. op., not designated for publication) ("[T]he '[D]octrine of [C]hances' may also come into play when using extraneous offenses to prove identity"). The Doctrine of Chances recognizes that highly unusual events are unlikely to repeat themselves inadvertently

23

or by happenstance. *See Carrizales v. State*, 414 S.W.3d 737, 745 (Tex. Crim. App. 2013) (where vehicle tires were time and again punctured by distinctive type of metal roofing screws repeatedly placed in same spot on roadway near defendant's driveway, the trial court could "reasonably apply Wigmore's '[D]octrine of [C]hances' to these facts to conclude . . . that the tire damage was caused by [the defendant's intentional act] rather than by an inadvertent accident").

For the Doctrine to apply, there must be a similarity between the charged and extraneous offenses, because it is the "improbability of a like result being repeated by mere chance that gives the extraneous offense its probative weight." *Brown v. State*, 96 S.W.3d 508, 512 (Tex. App.—Austin 2002, no pet.). Indeed, the degree of similarity between the characteristics of the extraneous offenses and those of the charged offense must be so great that they illustrate the defendant's "distinctive and idiosyncratic manner of committing criminal acts." *Page*, 213 S.W.3d at 336 (quoting *Martin v. State*, 173 S.W.3d 463, 468 (Tex. Crim. App. 2005)). The common characteristics must be "so unusual as to act as the defendant's 'signature,'" and the "signature must be apparent from a comparison of the circumstances in both cases." *Mason v. State*, 416 S.W.3d 720, 740 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

Without this high degree of similarity, "the probative value of the extraneous offense evidence is outweighed by its prejudicial effect." *Jabari*, 273 S.W.3d at 752

24

(citing *Bishop v. State*, 869 S.W.2d 342, 346 (Tex. Crim. App. App. 1993) ("The traditional rule in regard to the admission of extraneous acts for the purpose of showing identity is that the acts sought to be admitted must be so similar to the offense charged that the accused's acts are marked as his handiwork, that is, his 'signature' must be apparent from a comparison of circumstances in both cases.")). And "[e]vidence of an extraneous act which is sought to be admitted for the purpose of proving identity must demonstrate a much higher degree of similarity to the charged offense than extraneous acts offered for other purposes such as intent." *Bishop*, 869 S.W.2d at 346.

Common characteristics that might make extraneous offenses similar to the charged offense include "proximity in time and place, mode of commission of the crimes, the person's dress, or any other elements which mark both crimes as having been committed by the same person." *Segundo v. State*, 270 S.W.3d 79, 88 (Tex. Crim. App. 2008) (providing, as an example, "three bank robberies are committed over a four-year period in different cities in which the robber used an antique silver crossbow"). The extraneous offense evidence need not be completely identical to the charged offense to be probative, but "generic" similarities will not constitute a "signature crime" sufficient to allow its introduction. *Id.*

## C. The Trial Court Abused Its Discretion by Allowing Evidence of the Extraneous Laundromat Burglaries.

Toombs's identity as the perpetrator of the Smith's Grocery Store robbery was at issue during trial. *See Page*, 213 S.W.3d at 336 ("An extraneous offense may be admissible to show identity only when identity is at issue in the case."). Therefore, the question before us is whether the trial court erred under Rule 404(b)(1) by admitting evidence of the extraneous laundromat burglaries. That question turns in large part on the degree of similarity between the charged crime (the aggravated robbery of Smith's Grocery Store) and the extraneous offenses (the laundromat burglaries). *See Mason*, 416 S.W.3d at 740; *Jabari*, 273 S.W.3d at 752.

In our view, there was virtually no similarity between them. In fact, there was no evidence presented to the jury that would show a meaningful relationship between the crimes, or even that Toombs had any involvement whatsoever in the unadjudicated laundromat burglaries. To be sure, a crime lab report indicated Toombs's DNA was found at the laundromats. But that establishes nothing more than that Toombs was at a public laundromat at some point. There is nothing in the record, and the State presented nothing to the jury, to suggest Toombs committed a crime at the laundromats, that he stole coins from the laundry machines, or that he did anything other than enter the facility. In short, there was no evidence that Toombs was involved at all in the laundromat burglaries, and certainly no evidence

26

to illustrate Toombs's "distinctive and idiosyncratic manner of committing criminal acts." *Page*, 213 S.W.3d at 336.

Based on the scant information about them in the record, the laundromat burglaries were different from the Smith's Grocery Store robbery. The laundromat burglaries apparently were covert thefts of coins by a perpetrator who did not interact with any laundromat staff, whereas the Smith Grocery Store robbery was an armed robbery in which a masked perpetrator held a gun and forced the store's attendant to open a cash register drawer so he could take its contents. There was no blood found at the scene of the Smith's Grocery Store robbery. And the laundromat burglaries took place 11 months before the Smith's Grocery Store robbery. There is no "signature" characteristic of the laundromat burglaries that would indicate they were committed by the Smith's Grocery Store robber. *Cf. Segundo*, 270 S.W.3d at 88 (characteristics such as "proximity in time and place, mode of commission of the crimes, [and] the person's dress" may be useful in showing the criminal's "signature").

The State's reliance on the Doctrine of Chances to show otherwise is misplaced. The State points to Sergeant Land's testimony that Toombs's DNA was found at all three crime scenes, and that in his nearly 20 years as an Angleton police officer Sergeant Land had never encountered that situation. According to the State, this testimony implicates the Doctrine of Chances because "[t]he cases were unusual

27

in that the perpetrator left a recoverable amount of DNA at various scenes." But there is nothing unusual about the fact that Toombs's DNA was found in a public place; by itself, that evidence establishes nothing more than that Toombs was one of the many people who entered the laundromats. It does not link him to the laundromat burglaries, and it is not the "unusual or abnormal element" necessary for the Doctrine of Chances to apply. *Brown*, 96 S.W.3d at 512.

Sergeant Land's experiences with collecting evidence from multiple crime scenes are also not the "common similar characteristics" contemplated by the Doctrine of Chances. *Cantrell v. State*, 731 S.W.2d 84, 90 (Tex. Crim. App. 1987). The Doctrine of Chances refers to some unique characteristic inherent to the crimes themselves—rather than investigations of the crimes—that makes them so peculiar that the idiosyncrasy could not have been replicated by chance. "This is 'the mark of Zorro' mode of proving identity; it is a remarkably unusual fact, in which a single detail suffices to establish identity." *Segundo*, 270 S.W.3d at 88. Toombs's DNA being found in a public place is not the "mark of Zorro" or "remarkably unusual fact" necessary to justify the introduction of extraneous offense evidence. *Id.*

The trial court's belief that a sufficient degree of similarity was established by the fact that both the Smith's Grocery robbery and the laundromat burglaries were "property crimes" was also in error. That three offenses all fall into the general category of property crimes is at best a "generic" similarity against which the Texas

Court of Criminal Appeals has warned as a basis for allowing extraneous offense evidence. *See id.* ("But if the similarities are 'generic,' *i.e.*, typical to this type of crime, they will not constitute a 'signature' crime.").

Given the lack of any meaningful relationship between the laundromat burglaries and the Smith's Grocery Store robbery, let alone the lack of any evidence of similarities between them, allowing the introduction of extraneous offense evidence of the laundromat burglaries to establish Toombs's identity as the perpetrator of the Smith's Grocery Store robbery violated Rule 404(b)(1). Rule 404(b)(1) requires that extraneous offense evidence have "probative value beyond character conformity." *Blackwell v. State*, 193 S.W.3d 1, 13 (Tex. App.—Houston [1st Dist.] 2006, pet. ref'd). But here, the State failed to establish Toombs had any involvement in the laundromat burglaries, let alone that he committed them. There was nothing about the extraneous laundromat offenses that would help to establish Toombs's identity as the Smith's Grocery Store robber. Therefore, the laundromat burglaries had little if any probative value beyond their ability to show Toombs's propensity to steal, and thus, they were barred by Rule 404(b)(1).

Nor could the trial court's limiting instruction cure this error. A limiting instruction is not sufficient to cure error when the testimony "is clearly calculated to inflame the minds of the jury and is of such a character to suggest the impossibility of withdrawing the impression produced on the jurors' minds." *Castillo v. State*, 865

29

S.W.2d 89, 93–94 (Tex. App.—Corpus Christ-Edinburg 1993, no pet.). Considering the "inherently prejudicial" nature of extraneous offense evidence, *McGee v. State,* 725 S.W.2d 362, 366 (Tex. App.—Houston [14th Dist.] 1987, no pet.), coupled with the State's emphasis of the laundromat burglaries during closing arguments and its remark that "the DNA doesn't lie," the trial court's limiting instruction was incapable of "withdrawing the impression produced on the jurors' minds." *Castillo*, 865 S.W.2d at 93–94.

**D.    Admission of the Extraneous Offense Evidence Was Harmful.**

Finding error in the admission of evidence, however, does not end our analysis. We review the erroneous admission of extraneous offense evidence as non-constitutional error under Texas Rule of Appellate Procedure 44.2(b). *See Rodriguez v. State*, 546 S.W.3d 843, 860 (Tex. App.—Houston [1st Dist.] 2018, pet. ref'd). Under Rule 44.2(b), we disregard the error unless it affected the appellant's substantial rights. *See* TEX. R. APP. P. 44.2(b). A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict. *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). But an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001). We must examine whether the evidence had significant potential "to lure the

factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Old Chief v. United States*, 519 U.S. 172, 180 (1997).

As mentioned, extraneous offense evidence is "inherently prejudicial." *Plante v. State*, 692 S.W.2d 487, 494 (Tex. Crim. App. 1985) (citation and internal quotation marks omitted). And we cannot discount the likelihood that Toombs's DNA being found at the laundromat burglaries had a palpable effect on the jury. Indeed, the reliability of DNA evidence and the unadjudicated extraneous offenses became a theme of the State's closing. The State emphasized the reliability of DNA evidence during its closing, saying "the DNA doesn't lie." The State told the jury that Toombs's DNA had been found on the sweatpants worn by the Smith Grocery Store robber. And it also told the jury that Toombs's "DNA [was] at two other crime scenes" and "you know that his DNA [was] at the scene of two other burglaries"— the implication being that if Toombs's DNA was found at the laundromats and in the sweatpants, Toombs had committed the burglaries and the robbery.

The prejudicial impact of the extraneous offense evidence is also shown by the weaknesses in the evidence identifying Toombs as the robber during the guilt/innocence phase of the trial. The Smith's Grocery Store attendant did not identify Toombs as the robber, the video footage from the store's surveillance cameras did not allow the jury to identify Toombs as the robber, Toombs never made a confession, and Nichols's testimony was impeached on multiple points. As a result,

31

the question of Toombs's identity as the Smith's Grocery Store robber came down to two things: (1) whether the jurors believed Nichols's testimony identifying Toombs as the robber; and (2) whether they believed, based on the extraneous offense evidence, that the Smith's Grocery Store robber was the same person as the laundromat burglar. We cannot say, with fair assurance, that the verdict was not substantially swayed by the error in admitting the extraneous offense evidence, given the significance the State placed on it and the weaknesses in the State's identification evidence. *See Johnson v. State*, 43 S.W.3d 1, 4 (Tex. Crim. App. 2001) (discussing substantial-harm standard).

We acknowledge that there was other evidence supporting an inference that Toombs committed the Smith's Grocery Store robbery, including the testimony from Thomas, Toombs's half-brother, that Toombs had asked him to say they were watching a baseball game together the night of the robbery. But as the United States Supreme Court has noted, our substantial-harm inquiry cannot be merely whether there was enough evidence of guilt to support the judgment of conviction, apart from the error. *Kotteakos*, 328 U.S. at 764–65. Rather, the inquiry is "'whether the error itself had substantial influence,'" and, "'[i]f so, or if one is left in grave doubt, the conviction cannot stand.'" *Johnson*, 43 S.W.3d at 4 (quoting and applying *Kotteakos*, 328 U.S. at 764–65).

Because admission of the laundromat burglary evidence likely had a substantial effect on the verdict due to the State's emphasis on the evidence and the way the State incorporated it into its trial and closing theme without overwhelming evidence of Toombs's guilt, we conclude Toombs satisfied the substantial-harm standard. For these reasons, we sustain Toombs's second issue.

## Conclusion

We conclude there was sufficient evidence to support the jury's decision to convict Toombs for the aggravated robbery of Smith's Grocery Store. But because the trial court abused its discretion in admitting evidence of the extraneous, unadjudicated laundromat burglaries, and because that error was harmful, we reverse the trial court's judgment and remand for a new trial. Given our resolution of this issue, we need not reach Toombs's remaining argument attacking the extraneous offenses under Rule 403 or his third issue challenging the trial court's ruling on his motion for mistrial. *See* TEX. R. APP. P. 47.1.

Sarah Beth Landau
Justice

Panel consists of Justices Kelly, Landau, and Rivas-Molloy.

Do not publish. TEX. R. APP. P. 47.2(b).